UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 00-499 (DSD/SRN)

Oppenheimer Wolff & Donnelly, LLP, a Minnesota Limited Liability Partnership; Steven A. Wellvang, an individual,; Michael J. Bleck, an individual; Mark P. Wine, an individual,

Plaintiffs,

v.

**ORDER**

Vigilant Insurance Company, a New York corporation; Federal Insurance Company, an Indiana corporation; and Does 1-100, inclusive defendants,

Defendants.

Jeffrey J. Bouslog, Esq. and Oppenheimer, Wolff & Donnelly, 3400 Plaza VII Building, 45 South Seventh Street, Minneapolis, MN 55402, counsel for plaintiffs.

Dale M. Wagner, Esq. and Bassford, Lockhart, Truesdell & Briggs, 3550 Multifoods Tower, 33 South Sixth Street, Minneapolis, MN 55402, counsel for defendants.

This matter is before the court on the parties' cross-motions for summary judgment. Based on a review of the file, record, and proceedings herein, the court grants plaintiff's motion in part and denies it in part, and grants defendants' motion in part and denies it in part.

FILED 2-15-01
FRANCIS E. DOSAL, CLERK
Judgment Ent'd. 2-15-01
Deputy Clerk's Initials ______

## BACKGROUND

This declaratory judgment action involves an insurance coverage dispute between Oppenheimer Wolff & Donnelly LLP ("Oppenheimer") and three of its individual partners, and two of Oppenheimer's liability insurers, Vigilant Insurance Company ("Vigilant") and Federal Insurance Company ("Federal") (collectively referred to here as "the insurers").

Oppenheimer is a large Minnesota law firm with offices around the United States, including San Jose, California. In early 1999, Oppenheimer representatives began private discussions with several partners of Graham & James ("Graham"), a California law firm, regarding Oppenheimer's potential acquisition of Graham's Palo Alto office. Other partners at Graham eventually learned of these discussions and concluded that confidential financial and client information had been unlawfully provided to Oppenheimer. In June 1999, Graham sued Oppenheimer in California state court alleging: (1) misappropriation of trade secrets; (2) conversion; (3) unfair competition; (4) tortious interference with contract; (5) tortious interference with prospective economic advantage; (6) conspiracy to breach fiduciary duties; and (7) conspiracy to breach contract.

Graham brought several early motions which resulted in the issuance of a temporary restraining order on July 29, 1999 and a preliminary injunction on September 23, 1999. Graham also sought leave to expedite discovery and according to Oppenheimer, it has

served voluminous discovery requests on Oppenheimer. Oppenheimer hired the California law firm of Howrey & Simon to defend it in the early stages of the lawsuit, but tendered defense of the underlying action to Vigilant and Federal on August 4, 1999.

Vigilant issued Oppenheimer a general commercial liability insurance policy effective 01/01/1999 to 01/01/2000. The policy provides primary liability coverage with the following limits: $1 million personal and advertising injury, $2 million general aggregate and $1 million each occurrence. Under the terms of the policy, Vigilant agreed to defend and pay defense expense and damages for personal injury and advertising injury claims. The policy defines personal injury and advertising injury, in relevant part, as injury arising out of Oppenheimer's "oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." [Bouslog Aff., Exh. A at pp. 10, 13 of 16]. The policy excludes coverage for injury "arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity." [Id. at p. 5 of 9].

Federal issued a policy for the same period providing excess and commercial umbrella coverage with limits of $15 million on each occurrence. Under the excess liability provisions (Coverage A), no coverage is provided if the primary insurance does not cover the loss and there is no duty to defend unless the primary insurance

has been exhausted by payment of claims. The commercial umbrella policy (Coverage B) contains an endorsed exclusion for all personal injury claims but the policy does pay damages for advertising injury, which includes "oral or written publication of advertising material that slanders or libels a person or organization." [Wagner Aff., Exh. 15 at p. 11]. The policy excludes coverage for advertising injury if the oral or written publication of material is "done by or at the direction of the insured with knowledge of its falsity." [Id. at p. 9].[1]

On August 21, 1999, the insurers acknowledged the tender of the case and indicated that if they agreed to defend the claims pursuant to a reservation of rights, they would invoke their rights under California law to limit reimbursement for defense fees to $130 per hour.[2] On September 21, 1999, Oppenheimer forwarded to the insurers a copy of its defense counsel's initial invoices. According to one invoice, the primary attorneys involved in the

[1] Both policies were purchased by Oppenheimer through the insurers' authorized agent, W.A. Lang Company of Minneapolis.

[2] Under California law, if the reservation of rights creates a conflict of interest between the insurer and the insured, the insured has the right to demand independent counsel. See San Diego Navy Federal Credit Union v. Cumis Ins. Society, Inc., 162 Cal. App. 3d 358, 364 (1984); Cal. Civ. Code § 2860(a). However, when independent counsel is required, "[t]he insurer's obligation to pay fees to the independent counsel selected by the insured is limited to the rates which are actually paid by the insurer to attorneys retained by it in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended." Cal. Civ. Code § 2860(c).

defense were charging Oppenheimer anywhere from $325 to $455 per hour. [Wagner Aff. Exh. 11].

In December 1999, Phillip Thompson, an attorney representing the insurers, telephoned Jeffrey Bouslog, an Oppenheimer attorney. Thompson told Bouslog that the insurers would reimburse Oppenheimer for defense costs pursuant to a reservation of rights and would soon reimburse Oppenheimer for its initial outlays. Thompson did not object to the retention of Howrey & Simon as defense counsel and made no representation as to any limits on the hourly rate charged by that firm. [Bouslog Aff. ¶ 8].

Notwithstanding Thompson's oral representations that the insurers would pay defense costs, Oppenheimer paid Howrey & Simon $161,709 in fees on December 28, 1999 and an additional $84,127.35 in fees on January 21, 2000. Copies of invoices related to those two payments were forwarded to the insurers on January 27, 2000. In a letter dated January 21, 2000, Thompson wrote to Oppenheimer setting forth the insurers' written response to the tender. The insurers acknowledged potential coverage under the personal injury clause for disparagement of Graham's goods, products or services and on that basis they agreed to defend Oppenheimer under the Vigilant primary policy pursuant to a reservation of rights. They also confirmed that, pursuant to Section 2860(c), they would only reimburse Oppenheimer at a rate of $130.00 per hour.

On February 4, 2000, Federal delivered a check to Oppenheimer in the amount of $200,000, described as "an advance ... for defense fees and costs in connection with defense of the Graham & James suit" subject to a reservation of rights. On February 25, 2000, Oppenheimer forwarded additional invoices to the insurers totaling in excess of $335,000.00. On March 10, 2000, Oppenheimer wrote to the insurers demanding immediate payment of the outstanding invoices.[3] On April 20, 2000, Thompson wrote to Bouslog enclosing a one-page "fee audit" in support of the insurers' conclusion that they were obligated to pay only $161,633.21 of the $445,000 in defense fees billed to Oppenheimer. The letter included an offer to "provide a detailed report on [the insurers'] calculations upon request," but as of June 2000, they had not responded to Oppenheimer's request for such a report. [Bouslog Aff. ¶ 10].

Bouslog claims that on two separate occasions the insurers inquired as to whether Oppenheimer would consider transferring the defense to alternative counsel. In response to the first inquiry, Bouslog orally asked the insurers to identify its proposed counsel, but received no response. [Bouslog Aff. ¶ 11]. On April 28, 2000, when the parties met for their Rule 26 conference, counsel for the insurers again raised the issue of whether Oppenheimer would accept defense counsel selected by the insurers. [Id. at ¶ 12].

---

[3] As of March 10, 2000, Oppenheimer had paid $313,015 in fees and expenses with an additional $78,794 yet to be paid. [Bouslog Aff., Exh. K].

Oppenheimer responded orally and in writing by requesting a proposal for alternate counsel. The insurers again failed to respond. [Id.]

Oppenheimer filed this action seeking a declaratory judgment that Vigilant and Federal have breached their legal obligations to Oppenheimer. Defendants counterclaim for a declaratory judgment that the insurers have no duty to defend or indemnify Oppenheimer in the California action and that they are entitled to reimbursement for the defense costs they have advanced to date. The parties now bring cross motions for summary judgment on their respective claims.

**DISCUSSION**

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating to the court that no genuine issue of material fact exists. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material only when its resolution affects the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 250.

Summary judgment is particularly appropriate where the unresolved issues are primarily legal rather than factual. See Schrier v. Halford, 60 F.3d 1309, 1310 (8th Cir. 1995). The interpretation and construction of insurance policies is a matter of law, therefore such cases are "particularly amenable" to resolution through summary judgment. John Deere Ins. Co. v. Shamrock Indus., Inc., 929 F.2d 413, 417 (8th Cir. 1991).

**I. The Insurers' Defense Obligation**

**A. Interpreting the Duty to Defend**

The parties agree that Minnesota law should be used to determine whether there is coverage under the Vigilant and Federal policies. Under Minnesota law, an insurer's duty to defend is broader than the duty to indemnify. See Meadowbrook, Inc. v. Tower Ins. Co., 559 N.W.2d 411, 415 (Minn. 1997). To determine whether the insurer has a duty to defend, the court compares the allegations in the complaint from the underlying action with the relevant language in the policy. See Ross v. Briggs & Morgan, 540 N.W.2d 843, 847 (Minn. 1995). If any part of the claims asserted against the insured in the underlying action "arguably" falls within the scope of coverage, the insurer has a duty to defend. Id.

**B. Vigilant Policy**

Under the terms of its policy, Vigilant agreed to defend Oppenheimer and pay defense expense and damages for personal injury

and advertising injury claims. With respect to personal injury coverage, the policy defines personal injury to include the offense of "oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." [Bouslog Aff., Exh. A at p. 13 of 16]. The underlying complaint contains factual assertions which arguably fall within the scope of this policy language.

For example, Graham contends in its claim for misappropriation of trade secrets (Count I) that Oppenheimer told several of Graham's partners, associates and personnel that they would be without jobs because the Palo Alto office of Graham & James would be closed. [Wagner Aff., Exh. 13 ¶ 13]. Graham alleges that those statements caused Graham to suffer loss of business, loss of goodwill and damage to its reputation in the community. [Id. at ¶ 15]. Graham's claim for unfair competition (Count IV) incorporates those assertions and alleges more generally that Oppenheimer made "unfair, deceptive and untrue statements to employees and clients of Graham & James and competitors of Graham & James" resulting in damage including "the loss of profit that would have been realized had the conspiracy and defendants not interfered with the business relationships and contractual obligations between Graham & James and its partners, employees and clients." [Id. at ¶¶ 47-48]. Although the Minnesota Supreme Court has warned against a "far too generous reading of the complaint" in

order to resolve a coverage dispute, Ross, 540 N.W.2d at 848, the court need not strain to find that these allegations arguably fall within the coverage language found in the policies relating to oral or written publication of material which disparages another's goods and services.

The insurers argue that there is no duty to defend because the complaint fails to specifically state a cause of action for slander, libel, defamation or disparagement. However, the complaint does assert unfair competition, tortious interference with contract and tortious interference with economic advantage, which frequently encompass allegations of defamation and disparagement. Prosser notes, for example, that unfair competition is merely a general category to which innumerable torts may be placed:

> Unfair competition is now a generic name for a number of related torts involving improper interference with business prospects ... Quite apart from any improper motive, unfair competition, or for that matter other interferences with prospects, can be found when the defendant engages in any conduct that amounts to a recognized tort and when that tort deprives the plaintiff of customers or other prospects. Liability for such losses may be imposed for defamation, disparagement, intimidation or harassment of plaintiff's customers or employees...

W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 130, at 1013-1015.

With respect to tortious interference, Prosser describes similar doctrinal confusion:

> Undoubtedly the best and most inclusive name for the tort [of interference with commercial or economic relations] is that of 'injurious falsehood,' ... Since in every case of injurious falsehood the plaintiff must prove special damage, such as the loss of a present or prospective advantage, it seems clear the injurious falsehood claim should be regarded merely as one form of intentional interference with economic relations rather than as a branch of the more general harm to reputation involved in libel and slander ...
>
> ... Injurious falsehood, or disparagement, may consist of the publication of matter derogatory to the plaintiff's ... business in general, ... of a kind calculated to prevent others from dealing with him, or other to interfere with his relations with others to his disadvantage.

Id. § 128, at 964, 967.[4]

[4] See also Della Penna v. Toyota Motor Sales, U.S.A., Inc., 902 P.2d 740, 752 (Cal. 1995) (J. Mosk, concurring) (noting that the common law on the tort of intentional interference with prospective economic advantage, both in American jurisdictions generally and in California specifically, is "fast approaching incoherence," but holding that claim of interference with prospective contractual or economic relations requires proof that defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was "wrongful by some legal measure other than the fact of interference itself"); Balboa Ins. Co. v. Trans Global Equities, 267 Cal. Rptr. 787 (Cal. Ct. App. 1990) (discussing the "breadth and analytical vagueness" of unfair competition law, which may include claims for breach of contract, breach of confidential relationship, breach of fiduciary duty, interference with prospective economic advantage or, advantageous business relationships, interference with contractual relations and trade secret protection, each bearing their own elements of proof.)

In light of the conceptual overlap between these various claims, it would be imprudent to resolve this coverage dispute on the basis of how Graham did or did not label its claims. Moreover, this case is indistinguishable from Comsat Corp. v. St. Paul Mercury Ins. Co., 1998 U.S. Dist. LEXIS 2916 (D. Minn. 1998), in which the court found coverage under the primary policy's personal injury clause where the complaint contained a tortious interference claim based on allegations that the insured made misleading and disparaging statements to third parties. Therefore, the court concludes that the allegations that Oppenheimer made disparaging and untrue statements about Graham are sufficient to trigger the insurers' duty to defend Oppenheimer against a personal injury claim.

Similarly, the court believes there is a basis for coverage under the advertising injury clause of the Vigilant policy. Advertising injury is defined in the policy as:

> ... injury arising solely out of one or more of the following offenses committed in the course of advertising your goods, products or services:
>
> 1. oral or written publication of material that slanders or libels a person or organization that disparages a person's or organization's goods, products or services; ...

[Bouslog Aff., Exh. A, p. 10 of 16].

This languages tracks the definition of personal injury and arguably provides another, albeit weaker source of coverage under

the primary policy. The insurers contend that the complaint makes no specific allegations that Oppenheimer was engaged in any form of "advertising." However, the policy neither defines advertising nor contains any other language to suggest that the court must adopt a narrow definition of the term.[5] This court has previously found that the solicitation of business through one-on-one contacts constitutes "advertising" activity. See John Deere Ins. Co. v. Shamrock Indus., Inc., 696 F. Supp. 434, 439-40 (D. Minn. 1988); see also Home Ins. v. Waycrosse, 990 F. Supp. 720, 729 (D. Minn. 1996) (holding that coverage for advertising injury was triggered where the underlying complaint included tortious interference claims and factual allegations of marketing through unspecified publication of defamatory comments and misrepresentations). Therefore, in this case, where the underlying complaint alleges that Oppenheimer made disparaging statements about Graham to Graham's clients in an effort to solicit their business, coverage is triggered under the advertising injury clause of the Vigilant policy.

The insurers argue that even if they do have a duty to defend under the personal injury or advertising injury clauses, their defense obligation is obviated by the policy exclusion for known falsehoods. Specifically, the Vigilant policy excludes coverage

---

[5] By contrast, the Federal policy specifically provides a narrower definition of "advertising." See Part I.C. below.

for personal injury or advertising injury "arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity." [Bouslog Aff., Exh. A at p. 5 of 9].

Graham undeniably alleges in its complaint that Oppenheimer made untrue statements about Graham. However, Graham also alleges generally that Oppenheimer made unfair and deceptive statements in an attempt to induce Graham partners, associates, employees and clients to sign on with Oppenheimer. [Wagner Aff., Exh. 13 ¶ 47]. It is unclear from the face of the complaint whether such statements were false, and if so, whether Oppenheimer knew that they were false. For this reason, the applicability of the "knowledge of falsity" exclusion cannot be determined until the underlying action is concluded. See Prahm v. Rupp Constr. Co., 277 N.W.2d 389, 390 (Minn. 1979) (requiring insurer to defend suit where record before court did not clearly establish that the claim fell outside the coverage afforded by the policy). Cf. Callas Enters., Inc. v. Traveler's Indem. Co. of America, 193 F.3d 952, 957 n.5 (8th Cir. 1999) (affirming denial of coverage where "it would defy logic" to interpret the language in the complaint as alleging anything other than that insured acted falsely and with knowledge of that falsity.) Therefore, the insurers' motion for summary judgment on the issue of coverage under the primary policy

is denied and Oppenheimer's motion is granted with respect to the insurers' duty to defend under the Vigilant policy.

### C. Federal Policy

The excess coverage provisions of the Federal policy (Coverage A) essentially follow the form of the underlying Vigilant policy. Under Coverage A, Federal will pay on behalf of the insured losses in excess of the total applicable limits of the underlying insurance, unless of course the underlying insurance does not cover the claim. Because the court has concluded that the Vigilant policy provides coverage for the tendered claims, Federal's duty to defend under Coverage A will arise when and if the applicable limits of the Vigilant policy have been exhausted by payment of claims.

With regard to the umbrella protection (Coverage B), the policy contains an endorsed exclusion which eliminates personal injury coverage as follows: "It is agreed that, with respect to Coverage B, all references in the policy to personal injury are deleted and no coverage is provided." [Wagner Aff., Exh. 15]. However, the umbrella policy does pay damages for advertising injury, which includes "oral or written publication of advertising material that slanders or libels a person or organization." [Wagner Aff., Exh. 15 at p. 11]. The court understands Oppenheimer to suggest that the allegations in the underlying complaint trigger coverage under this clause. Essentially, Oppenheimer asks this

court to construe the alleged disparaging or untrue statements made to Graham's clients as "advertising material."

However, unlike the Vigilant policy, the Federal policy specifically defines advertising as "any paid: advertisement, publicity article, broadcast or telecast" [Wagner Aff., Exh. 15 at p. 12]. This definition compels the court to require some evidence or allegation that Oppenheimer engaged in the widespread dissemination of materials promoting itself at the expense of Graham. See Fox Chem. Co. v. Great Am. Ins. Co., 264 N.W.2d 385, 386 (Minn. 1978) (holding that where the term "advertising" appeared in the policy next to the broad terms "broadcasting" and "telecasting," "advertising" referred to widespread promotional activities directed to the public at large.) The underlying complaint contains no such allegation, therefore the court must conclude that there is no basis for coverage under the umbrella policy. The insurers' motion for summary judgment as to coverage under the umbrella provisions of the Federal policy is granted.

## II. Compensation of Counsel

### A. Choice of Law Analysis

Although the parties agree that Minnesota law controls the coverage determination, the insurers contend that the court should apply California law to resolve the dispute over the selection and payment of defense counsel in the underlying action. The threshold issue in a choice of law analysis is whether application of one

state's law over another is "outcome determinative" or creates an actual conflict. See Jepson v. General Cas. Co., 513 N.W.2d 467, 469 (Minn. 1994). In this case, an actual conflict does exist between California and Minnesota law because if California law applies, the insurers' obligation to pay defense fees is limited to the rates which they would pay to those attorneys they would ordinarily select to handle such litigation. See Cal. Civ. Code § 2860(c). Moreover, unlike Minnesota law, the California code provides that any fee dispute must be resolved by binding arbitration. Id.

In addition, the court finds that each state has significant contacts with the matter in dispute so that each state's law can be constitutionally applied in this case. See Jepson, 513 N.W.2d at 469. Therefore, a choice of law analysis must be made.

A federal court sitting in diversity is bound to apply the choice of law principles of the forum state. See American Cas. Co. v. Bank of Montana Sys., 675 F. Supp. 538, 545 (D. Minn. 1987). Thus, the court will follow the choice-establishing factors adopted in Milkovich v. Saari, 203 N.W.2d 408, 412 (Minn. 1973): (1) expectation of the parties and predictability of results; (2) maintenance of interstate and international order; (3) simplification of judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law.

Oppenheimer contends that the predictability of results factor favors the application of Minnesota law, arguing that an insured whose principal office is located in Minnesota and who purchased insurance coverage from a Minnesota broker would rightfully expect that Minnesota law would govern any dispute arising under the policy. The court agrees that such an insured should not have to fear that if it conducts business in another state and is sued there for its actions, its insurer will have the option of invoking whichever set of laws are most favorable to its position on coverage and reimbursement. That outcome would be contrary to the concept of predictability. See also American Cas. Co., 675 F. Supp. at 545 ("It would be highly inefficient and unfair to expect the insured to have to relitigate the scope and terms of the policy" based solely on the forum in which the underlying litigation was filed.) Therefore, the predictability factor weighs in favor of applying Minnesota law over California law.

With respect the advancement of the forum's governmental interest, application of this factor requires analysis not only of the forum state's interest, but also the public policies of the sister state. See id. California clearly has demonstrated an interest in the selection and compensation of defense counsel in suits brought in California because it has enacted legislation specifically addressing the matter. In fact, the presence of its detailed statutory scheme also implicates the second factor,

maintenance of interstate order, which is "concerned with whether the application of [one state's] law would manifest disrespect for [the other state's] sovereignty or impede the interstate movement of people and goods." Jepson, 513 N.W.2d at 471. However, the court believes that California's interest is matched by Minnesota's significant stake in protecting the rights of its insured residents under policies issued in this state and in regulating the activities of insurers who conduct business here. See American Cas. Co., 675 F. Supp. at 545. Therefore, these factors do not support the application of California law over Minnesota law.

The other two factors are not significant in this case. With respect to simplification of the judicial task, the law of either state could be applied without difficulty here. Further, the court believes that neither state's scheme represents a "better rule of law." Based on this analysis, the court concludes that Minnesota rather than California law should govern the issue of selection and compensation of defense counsel.

**B. The Insurers' Duty Under Minnesota Law**

Unlike California's statutory scheme, Minnesota statutes do not specifically address the resolution of disputes over the selection and compensation of an insured's independent counsel. However, in Minnesota, the duty to defend is read broadly. See Brown v. State Auto. & Cas. Underwriters, 293 N.W.2d 822, 825 (Minn. 1980). For example, it requires insurers to defend an

entire action and not just "to the extent of [the insurer's] own interests in the litigation." Mannheimer Bros. v. Kansas Cas. & Sur. Co., 184 N.W. 189, 190 (Minn. 1921).

In this case, the Vigilant policy unambiguously provides that Vigilant will pay "attorney fees and all other litigation expenses" for covered claims.[6] [Bouslog Aff., Exh. A at p. 10 of 16]. The insurers waited nearly six months before accepting Oppenheimer's tender. At that point, despite the clear language of the policy, they refused to fully reimburse Oppenheimer for defense costs and simultaneously ignored Oppenheimer's repeated requests for names of possible alternate counsel. This left Oppenheimer no choice but to continue paying defense counsel out of its own pocket. The insurers' conduct constitutes a breach of its duty to defend Oppenheimer in the underlying action, entitling Oppenheimer to reimbursement of its defense expense. See SPSC Corp. v. Allied Mut. Ins. Co., 536 N.W.2d 305, 318 (Minn. 1995); Prahm, 277 N.W.2d at 391 (noting that where insurer is obligated to defend its insured and contests coverage in the same suit, insurer must pay insured's reasonable attorney fees in defending the lawsuit).

---

[6] Specifically, the Vigilant primary policy provides that where personal injury coverage applies, Vigilant "will defend any claim or suit against the insured seeking such damages. We will pay in addition to the applicable limit of insurance the defense expense." [Bouslog Aff., Exh. A at p. 1 of 9]. Defense expense is defined as "payments allocated to a specific claim or suit for its investigation, settlement, or defense, including: 1. attorney fees and all other litigation expenses." [Id. at p. 10 of 16].

The court's determination that the insurers breached their duty to defend also imposes on the insurers the obligation to pay Oppenheimer's reasonable attorney fees in this declaratory judgment action. See Chicago Title Ins. Co. v. FDIC, 172 F.3d 601 (8th Cir. 1999). The insurers argue that Chicago Title is distinguishable because in that case the insurer waited two years before begrudgingly accepting the tender then refused to pay any of the underlying defense costs. 172 F.3d at 603-04. However, the insurers' decision to wait almost six months into a heavily litigated case before advising Oppenheimer that they would not pay a significant portion of its attorney fees is only marginally less offensive, and under these facts, the court cannot find that the insurers properly met their duty to defend. Therefore, the court grants Oppenheimer's motion for summary judgment as to its claim for reasonable attorney fees, the amount to be determined at a later date.

**CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendants' motion for summary judgment is denied as to the question of coverage under the Vigilant policy and the Federal excess liability provisions, but granted as to coverage under the umbrella provisions of the Federal policy.

2. Plaintiff's motion for summary judgment is granted as to coverage under the Vigilant policy and the Federal excess liability provisions, but denied as to coverage under the umbrella provisions of the Federal policy.

3. Defendant Vigilant is obligated to fully and completely defend Oppenheimer against the claims in the underlying action, therefore defendant Vigilant shall reimburse Oppenheimer for all reasonable defense costs incurred in the underlying action, including past, present and future costs, at the rates charged by Oppenheimer's selected counsel.

4. Defendant Vigilant shall also reimburse Oppenheimer for its reasonable attorney fees in bringing this declaratory judgment action, in an amount to be determined at a later hearing.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 15, 2001

David S. Doty, Judge
United States District Court

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEALNO.CIV
Rev. August 11, 1995